AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
06/22/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
June 22, 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KC___ DEPUTY

| United States of America | ) |
|---|---|
| v. | ) |
| JUAN MANUEL DENIZ | ) Case No. |
| | ) 5:21-mj-00435 |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of January 21, 2021 in the county of Riverside in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| ~~21 U.S.C. § 841(a)(1)~~ | ~~possession with intent to distribute controlled substances~~ |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

/S/
Complainant's signature

Jared Blevens, Special Agent/DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 22, 2021

[signature]
Judge's signature

City and state: Riverside, California    Honorable Sheri Pym, Magistrate Judge
Printed name and title

AUSA:  Tritia Yuen:  951-276-6222

**AFFIDAVIT**

I, Jared Blevens, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Juan Manuel Deniz ("DENIZ") for a violation of 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute a Controlled Substance on January 21, 2021.

2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### II. BACKGROUND OF AFFIANT

3. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

4. I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since January 2020. I am currently assigned to the Los Angeles Field Division ("LAFD"), Riverside District Office ("RDO"), in Riverside,

California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

5. During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction, money laundering techniques, conspiracy investigations, and asset identification, seizure, and forfeiture. During the academy, I was also trained on wire and electronic interceptions and the use of wire and electronic interception equipment. I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court-ordered wiretaps per California Penal Code Section 629 et seq.

6. I have participated in drug investigations, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances. I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who

have extensive knowledge of large-scale narcotics trafficking organizations. In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers. I have also reviewed electronically-intercepted communications and consulted with other law enforcement and legal personnel regarding the legal bases for the application and use of wire interceptions.

7. Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering. I am also aware of the tactics and methods employed by such individuals to avoid detection by law enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments. I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities. I am further aware that drug traffickers use wireless telephones subscribed in the names of other individuals, often times their spouses or other family members, to avoid law enforcement detection. Based on my training and experience, I have found that it is common for narcotics

traffickers to obtain, maintain, and use firearms in order to protect their narcotics and narcotics proceeds and that the cell phones they use have high call volume from a variety of telephone numbers.

### III. SUMMARY OF PROBABLE CAUSE

8. From October 19, 2020, to January 28, 2021, I had been acting in an undercover capacity and communicating with Giovanni HERNANDEZ ("HERNANDEZ"), via telephone. From October 19, 2020 to January 28, 2021, HERNANDEZ and I had several telephone calls discussing sales of methamphetamine, heroin, counterfeit oxycodone, and other illegal narcotics. The investigation has led to four seizures of narcotics coordinated by HERNANDEZ and the arrest of HERNANDEZ on January 28, 2021. HERNANDEZ is charged in Case No. ED CR 21-23-JWH. Prior to his arrest, on January 21, 2021, HERNANDEZ and I coordinated the purchase and delivery of approximately seven pounds of methamphetamine to an undercover DEA agent. DENIZ arrived to deliver the methamphetamine.

9. On or about June 22, 2021, along with four other DEA agents, I approached DENIZ as he was entering a vehicle outside of his residence in San Gabriel, California. I immediately recognized DENIZ as the individual who delivered approximately 2,718 grams methamphetamine to an undercover DEA agent on January 21, 2021. I also confirmed DENIZ's identity from his driver's license photograph and from previous surveillance in which I had participated. I and the other DEA agents verbally identified ourselves as police and also wore high-visibility

markings that identified us as law enforcement. I asked DENIZ to step out of his vehicle and explained to him our reason for presence. DENIZ agreed to talk to us within his apartment regarding our investigation. He denied knowledge of methamphetamine delivered on January 21, 2021. I arrested DENIZ at that time.

### IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A. DEA Investigation in Jacksonville, Florida

11. In August 2020, DEA SA Robney Bradshaw of the Jacksonville, Florida, District Office provided information to me regarding a DEA investigation being conducted by the Jacksonville District Office, including investigative reports prepared in furtherance of that investigation. The following subparagraphs summarize some of the information I learned:

a. SA Bradshaw informed me that the Giovanni Hernandez Drug Trafficking Organization ("DTO") in southern California was being investigated by DEA agents in the Jacksonville region. SA Bradshaw's investigation was using a CS[1]

---

[1] The CS has been working with agents in Jacksonville since August 2020. In May 2020, the CS was investigated by law enforcement in Florida for the state offense of conspiracy to traffic cocaine and heroin. He has not been arrested or charged for that conduct and is working for the DEA in Florida in hopes of avoiding prosecution for that offense. The CS has the following convictions in the state of Florida: a 1997 conviction for conspiracy to distribute cocaine, a 2011 conviction for tampering with evidence, and a 2016 conviction for resisting an

who had purchased large quantities of methamphetamine and heroin from HERNANDEZ coordinating his DTO's activities from Mexico. The CS coordinated the purchase of approximately six pounds of methamphetamine directly from HERNANDEZ. The methamphetamine was shipped from southern California to Jacksonville on September 8, 2020.[2] The CS identified HERNANDEZ as the person from whom he was purchasing methamphetamine and heroin, and confirmed HERNANDEZ's identity via photograph.

        b.  In October of 2020, DEA agents in Jacksonville instructed the CS to introduce an undercover ("UC") agent to HERNANDEZ as a potential buyer of methamphetamine and heroin. The CS provided HERNANDEZ a telephone number ending in 5322, which is a UC phone number that I maintain (the "UC telephone number"). As instructed, the Jacksonville CS represented to HERNANDEZ that the UC Telephone number belonged to the CS's cousin in Florida.

    B.    <u>DEA Investigation Begins in Riverside, California</u>

    12.  On October 19, 2020, HERNANDEZ contacted me via telephone on a telephone number ending with 5322 that the Jacksonville CS had given HERNANDEZ. My telephone number ending with 5322 was a recorded line in which I acted in an undercover ("UC") capacity (the "UC number"). The number that HERNANDEZ

---

officer without violence.  The CS has not received any financial benefit from the DEA for his work for the DEA.  To date, the DEA has found the information provided by the CS to be credible and reliable.

[2] Based on review of the surveillance footage from the UPS store relating to this shipment, agents believe that the person seen shipping the package containing the methamphetamine was Martha Vazquez, the mother of HERNANDEZ.  Vazquez is charged with HERNANDEZ in Case No. ED CR 21-23-JWH.

called me from was a telephone number ending with 2182. Subscriber information indicates that this was a cell phone. Based on my conversation with the CS, I knew that the CS had given the UC number to HERNANDEZ and represented to HERNANDEZ that I was a potential buyer of methamphetamine and heroin. This was my first conversation with HERNANDEZ, but I knew that it was HERNANDEZ because I had previously monitored calls between HERNANDEZ and the CS and recognized his voice. Also, the CS had told HERNANDEZ that I am the CS's "cuz." The word "cuz" is shorthand for the word cousin. While HERNANDEZ has never identified himself by name, I have conducted surveillance on some of his family members and have been able to corroborate that the person I have spoken to is in fact HERNANDEZ. From my training and experience, it is common for drug dealers not to use a name on telephone calls. And whenever I spoke to HERNANDEZ, he often referenced the CS as "your cuz."

    C.   <u>Attempted Purchase of Methamphetamine and Heroin on November 19, 2020</u>

    13. During this October 19, 2020 telephone call, HERNANDEZ and I discussed my purchasing 10 pounds of methamphetamine and one kilogram of heroin. During the conversation, we agreed that the methamphetamine would be sold for $2,500 per pound and that five pounds of methamphetamine would be purchased while a second five pounds would be "loaned" for me to sell on HERNANDEZ's behalf. We also discussed that a kilogram of heroin would be "loaned" to me for the same purpose. During this conversation, HERNANDEZ used "pops," short for "popsicles," to refer to

methamphetamine and referred to heroin as "the heavy ones" or "the one your cuz likes." HERNANDEZ referred to the CS as "your cuz" and the CS regularly purchases heroin from HERNANDEZ. I knew the meanings of the two words because, based on my training, experience, knowledge of this investigation, and conversations with CS, I knew HERNANDEZ's frequently used coded language to refer to methamphetamine and heroin.

14. On October 21, 2020, HERNANDEZ called my UC number while I was acting in a UC capacity as a potential drug buyer. HERNANDEZ discussed the prices of heroin and Oxycodone during this call. He did not refer to heroin by name, but I understood his reference based on my previous conversations with HERNANDEZ and my previous discussions with the Jacksonville CS. Through this investigation, I have had several conversations with HERNANDEZ to arrange the purchase and sale of narcotics. HERNANDEZ stated that he would ship the heroin at a price of $41,500 per kilogram and that it would cost $37,000 per kilogram if the product is picked up in California. HERNANDEZ also proposed the idea of me paying for one kilogram while the other would be "fronted," or loaned, until the product is sold and paid later. Later in the conversation, HERNANDEZ discussed the sale of "M-30's" which was a reference to counterfeit Oxycodone pills. I knew that "M-30's" referred to Oxycodone because Oxycodone often has "M-30" printed on the pills. "M-30" appears to be the way pharmacists and doctors identify the strength of the pill. From my training and experience, many drug dealers reference the number printed on the Oxycodone pill as a

shorthand way to reference the drug.  HERNANDEZ stated that the price of Oxycodone would be between $8-$9 a pill but quantities of up to 10,000 pills would result in a cheaper price per pill.

15. On November 7, 2020, HERNANDEZ called my UC number and asked if he could "serve" me on November 10, 2020, by which I understood him to mean delivery of 10 pounds of methamphetamine that we had previously discussed.  HERNANDEZ then told me that he was currently living in Mexico but that he had workers to handle his business within the United States.  Throughout numerous phone calls between November 7, 2020, and November 19, 2020, HERNANDEZ and I negotiated details surrounding a deal that we ultimately planned for November 19, 2020.  The deal that we finally agreed upon was that I would pay $12,500 for five pounds of methamphetamine priced at $2,500 per pound.  In addition, we agreed that HERNANDEZ would provide 500 counterfeit Oxycodone pills and a sample of heroin to be paid for at a later date.

16. On November 19, 2020, at approximately 10:30 a.m., I returned a missed call from HERNANDEZ.  I recognized the number as the number HERNANDEZ uses to call my UC number.  HERNANDEZ confirmed that "everything is good for 12:30 to 1:00" and advised me to "be ready."  I sent a text message to HERNANDEZ at approximately 12:10 p.m. informing HERNANDEZ that I would be in the vicinity of the Eastvale Gateway area, a shopping plaza in Eastvale, Riverside County.  HERNANDEZ responded that he would let me know when the courier was close so that I could send him an exact address.

17. At approximately 1:08 p.m., I called HERNANDEZ to check on the status of the delivery. He told me that the courier had to go to "different offices," which I understood to be two different stash locations for illegal drugs. From my training and experience, I know drug traffickers often keep different drugs, in this case methamphetamine, heroin, and Oxycodone, in different locations. HERNANDEZ then told me that the courier was stuck in traffic and that the delivery would take another hour to ninety minutes.

18. At approximately 2:43 p.m., HERNANDEZ called me on my UC number to tell me that the delivery would not arrive until 6 p.m. or 7 p.m. Because I had previously represented to HERNANDEZ that I had flown to southern California from Jacksonville, Florida, and that my flight back to Jacksonville was in the evening of November 19, 2020. HERNANDEZ asked me if I could change my return flight to the next day, November 20, 2020.

19. Approximately two minutes and 23 seconds into the phone call, I could hear an additional phone ringing in the background. HERNANDEZ then told me that "right now I'm on the line with the other dude, literally," and "he's literally on the line right now with me." For the reasons outlined below, I believe that the "other dude" that HERNANDEZ referred to was the individual with whom HERNANDEZ was coordinating the delivery of drugs.

20. I requested that HERNANDEZ have the courier call me directly to verify his or her location. Approximately five

minutes and 52 seconds into the same phone call and again at seven minutes and 16 seconds, I heard another phone ringing in the background.

21. At approximately 5:33 p.m., I sent a text message to HERNANDEZ suggesting that if the courier were to call me and I could verify that he was close, I would consider missing the flight and completing the deal. HERNANDEZ called me a few minutes later and told me that the courier was in Ontario, California, but that HERNANDEZ could not give me the courier's telephone number because his "homie is the one controlling him," suggesting that HERNANDEZ had been coordinating the courier's delivery of drugs to me through the courier's handler.

22. At approximately 5:47 p.m., I received a text message from HERNANDEZ stating "Ok I can pass you his number." At approximately 5:57 p.m., HERNANDEZ texted me to tell me, "he is going to call you."

23. Three minutes later, at approximately 6:00 p.m., I received a call from a number ending in 6980, on my UC number. The male who called me told me that he had received my telephone number "through one of my buddies" and that "I've got my driver but he's just a little busy right now." I believe the reference to "my driver" was to the drug courier about whom HERNANDEZ had been texting me. The caller told me that he was in Riverside, California and that he could make a delivery happen between 7 p.m. and 8 p.m. He then told me, "I've got the stuff here with me, you know, but he [the driver] is running the play for me real quick. He went to drop off some other things to some other

guy." Based on my training and experience, I know that the reference to having "the stuff here with me" was in reference to the negotiated quantity of methamphetamine, heroin, and Oxycodone that I previously negotiated with HERNANDEZ. As it appeared to me that the delivery was not going to happen that day, I told the caller that I could not wait longer.

24. The unidentified male caller proceeded to apologize and told me that he would contact "your boy" to tell him that I was not going to wait any longer. Based on my knowledge of this investigation, I understood "your boy" to be HERNANDEZ. As with HERNANDEZ, the caller appeared to understand that I was boarding a flight and returning to Florida. Later that night, I received a text message from HERNANDEZ stating "My bad bro I can send them Monday over night ones we get rolling trust me you will make paper with me on your team." I never followed up on this offer.

   D.   Purchase of Heroin on December 2, 2020

25. In the days leading up to December 2, 2020, I had several phone calls with HERNANDEZ while I was acting in an undercover capacity. HERNANDEZ and I agreed that I would purchase one kilogram of heroin for $12,500 and pay an outstanding amount at a later date. I told HERNANDEZ that my girlfriend, who was in fact another undercover DEA agent ("UC2"), would be delivering the payment and picking up the heroin. I had several phone calls with HERNANDEZ through the morning and afternoon while waiting on a courier to deliver the drugs, and at approximately 1:48 p.m., HERNANDEZ called to tell

me that "They'll be there in forty-five," referring to the amount of time HERNANDEZ believed it would take for the courier to arrive. HERNANDEZ called me again at approximately 2:29 p.m. to tell me that "He's there. He has a white Jeep." At the same time, DEA SA Jassmine Yeagley observed a white jeep with CA license plate 8TBY065 arrive and park next to our undercover vehicle occupied by a DEA Special Agent. The courier that arrived in the Jeep entered into UC2's car and displayed a brick-like package contained inside of a Maravillas Cookie Box. I know from my training and experience that illicit heroin is packaged in vacuum-sealed bags and with cellophane, consistent with the package that was delivered by the courier.

26. On December 3, 2020, the suspected heroin was sent to the Southwest Laboratory in Vista, California, to be tested and results showed the package contained 998 grams of a mixture and substance containing fentanyl.

  E. <u>Purchase of Methamphetamine on January 21, 2021 Delivered by DENIZ</u>

27. On the days leading up to January 21, 2021, I had several phone calls and text messages with HERNANDEZ to coordinate the purchase of methamphetamine. HERNANDEZ and I agreed that methamphetamine would be paid for in cash and would cost $2,500 per pound, with any additional amounts that were loaned or "fronted" costing $3,300 per pound. On January 15, 2021, HERNANDEZ called to inform me that "everything good to serve you . . . I'm going to have them over there." I understood HERNANDEZ's reference to mean that he would have

methamphetamine in the Los Angeles area that would be ready for delivery whenever I arrived in California.  I spoke to HERNANDEZ again on January 19, 2021, and told him that I wanted to have the methamphetamine delivered on Thursday, January 21, 2021.  On January 21, 2021, HERNANDEZ and I spoke on the phone regarding the delivery of methamphetamine.  I told HERNANDEZ that my girlfriend, UC2, would pick up the drugs and deliver $10,000 cash as payment.  On a phone call at approximately 3:40 p.m., HERNANDEZ told me that a driver was on the way.  At approximately 5:45 p.m., HERNANDEZ called and informed me that the driver had arrived at the determined location in Eastvale, California for the drug deal to happen and that he was in a black BMW car.  At approximately 5:48 p.m., a DEA aviation asset captured a vehicle arrive and park in front of UC2's car on recorded aerial surveillance video.  Surveillance units in the parking lot confirmed that the vehicle was a black BMW, just as HERNANDEZ indicated.  The driver of the vehicle, later identified by UC2 as DENIZ, walked to UC2's car and passed off a cardboard box originally used for packaging of a vehicle carburetor.  Within the box was a large Tupperware container heavily wrapped in packaging tape and an additional black plastic bag.

    28. UC2 was wearing a device that recorded her conversation with DENIZ.  Review of the undercover audio recording reveals DENIZ speaking on the phone to a third party as he met with UC2.  In listening to the recording from UC2's recording device, I clearly heard the voice of HERNANDEZ asking DENIZ in Spanish if he was already with the female.  UC2

confirmed that DENIZ temporarily had his phone on speakerphone mode when UC2 met with DENIZ. In reviewing the recording, I later heard DENIZ ask HERNANDEZ about the amount of money that he should receive from UC2, and HERNANDEZ confirmed that DENIZ should receive "ten," referring to ten thousand dollars. UC2 confirmed she paid DENIZ ten thousand dollars by showing the payment to DENIZ and stating that there was "five and five." Her statement of "five and five" referred to the money being separated into two separate bundles, each containing five thousand dollars.

29. The suspected methamphetamine was sent to the DEA Southwest Laboratory in Vista, California on January 25, 2021 for analysis. Lab analysis results revealed that it contained approximately 2,718 grams of actual methamphetamine.

F. Identification of Juan Manuel DENIZ

30. A query of the California Department of Motor Vehicles ("DMV") revealed the black BMW bearing California license plate AW37S41, is registered to a Rebeca Kernes and Juan M. DENIZ at 10525 Somerset Blvd, Space (Spc) 39, Bellflower, CA 90706. On February 10, 2021, DEA Intelligence Research Specialist ("IRS") Maite Branscome conducted a query of the CA DMV and found that the vehicle bearing temporary plate AW37S41, had been assigned a new California license plate 8URX543.

31. IRS Branscome conducted a query of the California DMV database to obtain information for California driver's license number F4589476, assigned to Juan Manuel DENIZ at 2219 E. 124th St, Compton, CA 90222. According to California DMV records,

DENIZ was born in 1996, and is described as a male, 5'05" tall, brown eyes, black hair, and a weight of 200 pounds.

32. A copy of DENIZ's driver's license was provided to UC2, who exchanged the drugs and money with DENIZ. UC2 confirmed that DENIZ was the individual that delivered the drugs and received payment for the drugs on January 21, 2021.

G.  Installation of Vehicle Tracker on DENIZ's Vehicle

33. On February 17, 2021, the Honorable Sheri Pym, United States Magistrate Judge for the Central District of California, signed ORDER 5:21-MJ-00105, authorizing the installation, use, and monitoring of a GPS tracking device on a black, 2017 BMW, with CA license plate 8URX543 and VIN WBAJA5C33HG89482.

34. On February 26, 2021, I observed DENIZ arrive at 11640 Louise Ave., Lynwood, California in his vehicle. I then observed DENIZ retrieve a red bag from the trunk of his vehicle and toss it to an unidentified male that was standing outside of the business at that ocation. Based on DENIZ's previous actions following the January 21 deal and the limited time that DENIZ spent at the location on February 26, I believe that the red bag DENIZ gave to the individual contained money from drug proceeds.

35. Shortly after DENIZ left 11640 Louise Ave., Lynwood, California, his vehicle was stopped near the intersection of Martin Luther King Jr. Blvd and E Imperial Hwy in Lynwood, CA for having no front license plate. According to Deputy Jason Chavez, who conducted the stop, DENIZ and his passenger had large amounts of money on their person. The passenger with DENIZ was identified as Gilberto Esquivel ("ESQUIVEL"). I

learned that ESQUIVEL was arrested by DEA agents on August 8, 2013, when he was present when a state search warrant was executed and $48,800.00, cocaine hydrochloride and cocaine base, a .45 caliber handgun, and packaging equipment were seized.

36. During the course of the traffic stop, I installed a GPS vehicle tracker on DENIZ's vehicle.

H.  Information Learned from the Vehicle Tracker

37. On March 4, 2021, I conducted research on all of the significant locations where DENIZ's vehicle traveled, based on information received from the vehicle tracker that I installed on DENIZ's vehicle on February 26, 2021.  I learned that DENIZ typically stays overnight at an address at or near 1552 Prospect Ave., San Gabriel, California.  I confirmed that DENIZ stayed overnight at this location on March 8, 2021, when DEA agents observed DENIZ's vehicle there overnight and saw DENIZ leave in his vehicle in the morning.

I.  Arrest of DENIZ on June 22, 2021

1. On or about June 22, 2021, I, along with four other DEA agents, approached DENIZ as he was entering a vehicle outside of his residence located at 1542 E Prospect Ave., San Gabriel, California.  I immediately recognized DENIZ as the individual that UC2 confirmed as the courier who delivered methamphetamine on January 21, 2021.  I recognized DENIZ from his California driver's license photo as well as from previous surveillance operations.  I and the other DEA agents verbally identified ourselves as police and also wore high-visibility markings that identified us as law enforcement as we approached

DENIZ. I asked DENIZ to step out of his vehicle and explained to him our reason for being there. DENIZ agreed to talk to us within his apartment regarding our investigation.

2. Before entering DENIZ's apartment, we asked him to confirm that there were no guns, drugs, or additional people inside. DENIZ informed us that his wife and child were the only ones who lived there and admitted to having two firearms in the apartment. We entered the apartment while being escorted by DENIZ and he allowed us to walk through to confirm that there were no additional people in the apartment. I sat at the dining table with DENIZ and verbally advised him of his Miranda Rights. I also provided DENIZ a written copy of his Miranda Rights, which he initialed and signed to acknowledge that he understood his rights. He stated that he was willing to talk to us regarding the investigation.

3. I explained to DENIZ that UC2 confirmed his identity as the courier that delivered methamphetamine on January 21, 2021 in Eastvale, California. DENIZ claimed no knowledge of the event. I then explained in detail the events and locations where we saw DENIZ on the evening of January 21, 2021, following the drug deal. DENIZ continued to maintain having no knowledge of the events.

4. I asked DENIZ about the black BMW, which he owned and that was the same vehicle that delivered drugs on January 21, 2021. DENIZ claimed ownership of the vehicle but stated that the vehicle was recently wrecked and he was no longer driving it.

5. I asked DENIZ where he picked up the drugs on January 21, 2021 and where he delivered the money that he received. DENIZ again denied any knowledge of the events.

6. At that time, we terminated the interview and I arrested DENIZ.

## V. CONCLUSION

7. For all of the reasons described above, there is probable cause to believe that Juan Manuel DENIZ has committed a violation of 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute a Controlled Substance.

/S/
Jared Blevens
DEA Special Agent

Subscribed to and sworn before me
this  22nd day of June, 2021.

HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE